IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **BRITTANY HENLEY** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | |
| | § | Civil Action 3:18-cv-01777-M |
| **ABBESELOM GHERMAY, M.D.; and** | § | |
| **DALLAS NEUROSURGICAL & SPINE** | § | |
| **ASSOCIATES P.A. D/B/A MOMENTUM** | § | |
| **PAIN MANAGEMENT,** | § | |
| | § | |
| **Defendants** | § | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. MATTHEW LEE

### TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

COME NOW, Defendants Dallas Neurosurgical & Spine Associates, P.A. d/b/a Momentum Pain Management and Abbeselom Ghermay, M.D. and file this Motion to Exclude Testimony of Dr. Matthew Lee and would respectfully show the court as follows:

Defendants respectfully request that the Court preclude expert testimony from plaintiff's expert Matthew Lee on the issue of breach of the standard of care, specifically as to the opinion that defendants breached the standard of care in failing to have certain policies and procedures in place related to messages and recall response.

Plaintiff served expert disclosures pursuant to FRCP 26(a)(2)(B) designating Dr. Matthew Lee as an expert. The disclosure references Mr. Lee's report for a complete statement of all the opinions the witness will express and the basis for them. See Doc. 94, Exhibit B. The report of Dr. Lee is attached thereto. See Doc. 94 beginning at p. 10. The report states that Dr. Lee's opinion is that Brittany Henley developed fungal meningitis from injections with adulterated MPA procured from NECC that Dallas Back Pain Management had previously

received notice of an urgent recall for. See Doc. 94 at p.10. Attached to the report at p. 13-16 is a narrative discussing the opinions of Mr. Lee. The final section discusses his opinions regarding standards of care and violations of standards of care. In this section he specifically sets out the alleged breaches of standard of care on the part of Defendant Dallas Neurosurgical & Spine Associates, PA. Dr. Lee contends that the defendants failed to conduct due diligence to include a site visit and/or background investigation of the compounding pharmacy who supplied the alleged contaminated steroid medication. In addition, he takes issue with the method of ordering the medication in bulk and use after month-long storage.

Dr. Lee was deposed on October 22, 2019. At his deposition it became clear that he had reviewed additional materials that were not disclosed in his report and previous disclosure. In fact, Dr. Lee testified that he received depositions and clinic notes after the date of his report. These materials were available prior to this time, however were not provided or reviewed. See Exhibit A at p. 25 – 27. Moreover, it became apparent that he was offering opinions on topics outside the scope of his disclosure and report. Dr. Lee offered testimony regarding policies and procedures related to the practice and educating staff members. He offered testimony on substandard care as a result of retrieval of messages and emails. See Exhibit A p. 118-121. He has agreed that this topic is not addressed in his report and or disclosure. See Exhibit A at. p. 123-126. Because Plaintiffs expert designation is deficient, Defendants have filed this Motion seeking the exclusion of Plaintiffs expert testimony regarding breach of the standard of care related to policies and procedures of the practice as well as breach for failure to educate the staff.

If a party fails to provide information or identify a witness as required by FRCP 26(a)(2)(B) the party is not allowed to use that information or witness to supply evidence on a

motion, at a hearing, or at trial. See FRCP 37. (c)(1). Defendant moves to exclude this testimony and preclude Dr. Lee from offering opinions at any hearing, motion or trial outside the scope of the topics previously disclosed by plaintiff.

WHEREFORE PREMISES CONSIDERED, Defendants respectfully request that Dr. Lee be precluded from testifying as to breach of the standard of care due to the lack of policies and procedures related to retrieval and review of messages and response to recall notices and for any and all other relief to which they may show themselves justly entitled.

Respectfully Submitted,

**The Fraley Firm, an office of**
**Beard Kultgen Brophy Bostwick & Dickson,**
**PLLC**
901 Main Street, Suite 6300
Dallas, Texas 75202
Telephone: (214) 761-6460
Facsimile: (214) 761-6469

*/s/ Elizabeth M. Fraley*
**ELIZABETH M. FRALEY**
State Bar No. 13180500
efraley@fraley-law.com

**ATTORNEYS FOR DEFENDANTS**
**DALLAS NEUROSURGICAL & SPINE**
**ASSOCIATES, P.A. D/B/A MOMENTUM PAIN**
**MANAGEMENT AND**
**ABBESELOM GHERMAY, M.D.**

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, I electronically filed the foregoing Motion with the Clerk of the Court using the ECF System for the U. S. District Court, Northern District of Texas which will send notification of such filing to all registered participants.

/s/ *Elizabeth M. Fraley*
Elizabeth M. Fraley

Mr. Jim Girards
Girards Law Firm
10000 N. Central Expy, Suite 400
Dallas, Texas 75231
Attorney for the Plaintiff

# EXHIBIT "A"

UNEDITED, UNPROOFED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

\*\*\* UNEDITED DRAFT COPY \*\*\*

Please note:

Page and line numbers from this draft will not match exactly with the final certified transcript; therefore, this uncertified rough draft cannot be quoted in any pleading or for any other purpose and may not be filed with any court.

\*\*\*   \*\*\*   \*\*\*

This uncertified draft conforms with
Guidelines for Professional Practice
National Court Reporters Association
Section IV, Parts 1 through 9

\*\*\*   \*\*\*   \*\*\*

ROUGH DRAFT

UNEDITED, UNPROOFED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

    Here we go. I'm going to mark as Exhibit 5 a report from from April 8th, 2014. Is that, indeed, what Exhibit 5 is?

  A. It is.

  Q. All right. And then Exhibit 6 is a report from September 16th, 2018, correct?

  A. Correct.

  Q. And then Exhibit 7 is a list of materials reviewed that now includes depositions and clinic notes. Let me ask you again: When were you provided those depositions?

  A. After September 16th, 2018, probably, but --

  Q. Well, some of them weren't taken before that. So obviously they claim later?

  A. Right. But I don't recall specifically when I got -- when I got any of them. I don't know.

  Q. Well, you have not updated your report or issued any new opinions, correct?

  A. Since 2016, correct -- September 16th, 2018.

  Q. All right. So I take it that none of the depositions or documents that you were provided subsequently have caused you to form new

ROUGH DRAFT

opinions or alter your opinions, correct?

A. Well, yes and no. It has not changed my opinion that she developed fungal meningitis because she was injected with adulterated preservative free methylprednisolone. So since is that time, I learned about the -- or I might have -- the recall notices coming in and not being given attention until a day and a half later that they were not documenting lot numbers or expiration dates from the vials used on specific patients, that Dr. Ghermay did not do any research or due diligence looking into purchasing bulk compounded medications.

Q. Doctor, it's been 13 months since you wrote that report. You understood that we were going to fly to Virginia to take your deposition, correct?

A. At that time?

Q. No. You knew now. You had some weeks of advance in the that we were coming here, correct?

A. Okay.

Q. And it's been 13 months since you wrote your report?

A. Okay.

ROUGH DRAFT

    Q.    And you apparently received additional materials after that, correct?

    A.    Yes.

    Q.    And you understood, because you have been involved in many lawsuits as a retained expert witness, that if you had new or different opinions, you needed to notify Mr. Girards or issue a supplemental report so we had fair notice of them, correct?

    A.    No. Not specific, no. If I'm asked to write something, yes. But if I receive additional information, no, I did not know I was expected to write an addendum or report.

    Q.    So Mr. Girards did not, when he sent you these additional materials, was Mr. a cover letter or an email that came with these materials?

    A.    Probably they came with an email.

    Q.    Yeah, and there was probably something on there saying please review these or let me know if you have opinions about them, right?

    A.    Possibly.

    Q.    Well, and you understood that the purpose of your reviewing them was to see if you had any opinions about what was in there, or if

ROUGH DRAFT

Q. Okay. Now, what's the rationale for this prohibition to your understanding on ordering bulk medication of compounded preservative free?

MS. FRALEY: Objection, form.

THE WITNESS: Because ordering it in bulk it's not patient specific. So therefore there may be another product in a is commercially available that is manufactured according to FDA regulations that doesn't pose the same risk. So again, so you have a compounding pharmacy manufacturing bulk orders, and so that's the contradiction. A compounding pharmacy cannot manufacture, but when making things in bulk, that's manufacturing.

Q. All right, then, fast forward and we see that Dr. Ghermay is contacted by a phone call from NECC and that message was left with the answering service at 2 a.m, which we see reflectd in the documentation produced by Dr. Ghermay's office. I want to talk to you have about that. As I understand the testimony, that email -- that voicemail was memorized in the form of an email sent to Mr. Garcia and Mrs. Adams and Karen best, and that nobody responded to it. Do you have an opinion about whether that represents substandard

ROUGH DRAFT

care by Dr. Ghermay and his Dallas back pain management?

    MS. FRALEY: Objection, form and leading.

    THE WITNESS: Ultimately Dr. Ghermay is responsible for his employees and their actions. I believe the fact that the message came in that mentioned the word quarantine, come is a pretty serious word, as well as contaminants or items floating.

    Q.    Tar tick let's?

    A.    Particular at matter in vials, I think that's significant. It came in N the email to three people, but nobody checked or nobody looked into it. I think that's below the standard of care because immediately at that time was the moment or there was the greatest potential to prevent it being administered to patients.

    Q.    Then as a medical director, is that a physician's responsibility to educate the staff and to have policies or procedures in place to require them to check their emails timely and respond to such notices?

    MS. FRALEY: Objection, form and outside the scope of his designation.

    ROUGH DRAFT

Q.   Do you have an opinion about that?

MS. FRALEY:  Same objections.

THE WITNESS:  Yes.  I mean, there should be some education of the staff or some policy that they are aware that this is an important thing that needs to be to be addressed or to even check to see if something comes in.

Q.   Okay.  And then as I understand the testimony a fax came inform at 4:30 in the afternoon and went to those same three people, and that was not responded to for that day.  Do you have an opinion about whether that was below the standard of care as well?

A.   Correct.  So again, you have a fax that says urge enter and it was not acted upon, another step that could have prevented patients from receiving the contaminated injections.

Q.   What is the expected response to each of these notifications?

A.   Immediate.

Q.   Immediate what?

A.   Immediate response.  So once the message comes in, there should be an alert, but they should also check and immediate action.

Q.   And the action required would be

ROUGH DRAFT

what?

A.   To quarantine the vials of the injectable.

Q.   And then with respect to the causation issue that you discussed with Ms. Fraley a short minute ago, please explain what you were talking -- what you were trying to say about your opinion that -- with respect to Dr. Ghermay and Dallas back pain management being the cause of harm to Ms. Henly as compared to NECC's producing the contaminated medication.

A.   That Ms. Henly was administered contaminated MPA injection, that a recall had been issued on, she still received the injection, and then subsequently she was diagnosed with fungal meningitis.

Q.   Okay.  And then the fact that NECC actually notified Dr. Ghermay and Dallas back pain management on two occasions, how does that impact this causation analysis that you have offered?

MS. FRALEY:  Objection, form.

THE WITNESS:  That puts the responsibility on Dallas back pain management to follow -- to adhere to the recall, and quarantine the medication.

ROUGH DRAFT

meningitis, correct?

A. That's correct.

Q. Now, are you aware of any FDA approved, manufactured preservative-free injectable steroid that was commercially available in 2012?

A. No.

Q. Okay. And so if a medical decision was that the patient needed or that the prudent course of action for the patient was use of a preservative free steroid that, was going to require a compounded variety, correct?

A. Correct.

Q. Okay. You talked briefly about education of staff and policies. You agree there is nothing about education of staff or policies or procedures in your 2014 report, correct? And feel free to pull it out and take a look, if you want.

A. Repeat the question, please.

Q. You have nothing about educating clinic staff or creating policies and procedures for clinic staff in either your 2014 or your 2018 report, correct?

A. Not specifically, no.

Q. I am correct about that, right?

ROUGH DRAFT

  A. I do not specifically say that.

  Q. All right. And it's not in your 26B disclosure that you'll be talking about policies or procedures of training of clinic staff, is it? And that disclosure is attached as an exhibit if you want to take a look at it?

  A. I mean, it's almost along the lines of common sense; however, having a written procedure would be helpful in the fact that a staff gets a recall notice that it's acted upon. I think even -- well --

  Q. Objection, nonresponsive. In the federally-required 26B disclosure, you are not identified as a witness who is going to talk about policies and procedures or training for clinic staff, right?

  A. It's not specifically mentioned in those words.

  Q. Well, in any words in your report or in the disclosure do you identify anything about training or education of clinic staff as opposed to what you have referred to as due diligence by the physician in many clinic in investigating the compounding pharmacy?

  A. I mean, I think it goes along with

ROUGH DRAFT

UNEDITED, UNPROOFED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

the due diligence. I mean, the fact that you are ordering a compounded medication which in and of itself increases the inherent risk, it would be -- and as a physician would know that, again, there is a greater chance of recall. So if he's undertaken that additional degree of responsibility by ordering a compounded medication versus a manufactured one, it's something that should be addressed because there's a greater potential for a compounded medication to be recalled. That would involve writing down -- that are inpatient rejected into individual patients too.

    Q.    Objection, nonresponsive. Doctor, look in your report from 2014 and show me where you use any word about education, policy or procedures about clinic staff?

    A.    Again, I agree it's not specifically mentioned.

    Q.    Okay. And that is true for both reports and the disclosure, right?

    A.    That is not specifically mentioned in those words.

    Q.    All right. And I think what you said is it's just common sense, right?

ROUGH DRAFT

UNEDITED, UNPROOFED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

UNEDITED, UNPROOFED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

    A.    No: I think even if -- there should be policies and procedures in there written to address it; however, I think if a person sees the word quarantine, there is a degree of significance with in a.

    Q.    Objection, oh nonresponsive. Doctor, I'm really talking about disclosing?

    A.    Disclosing what?

    Q.    Whether you were going to offer opinions on this. It's not in either report or the 26B disclosure, right?

    A.    Again, I think it's along the lines of due diligence. I mean, again --

    Q.    We'll see if the federal judge agrees with you. I'll pass the witness?

    MR. GIRARDS: I'll reserve mine to the time of trial.

    MS. FRALEY: I think we're done.

ROUGH DRAFT

UNEDITED, UNPROOFED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT